**Opinion issued March 31, 2026**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-24-00220-CV
_____

**LANCE CHRISTOPHER KASSAB AND LANCE CHRISTOPHER KASSAB, P.C. D/B/A THE KASSAB LAW FIRM, Appellants**

**V.**

**MICHAEL A. POHL AND THE LAW OFFICE OF MICHAEL A. POHL, PLLC, Appellees**

---

**On Appeal from the 281st District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-58419**

---

## O P I N I O N

This appeal arises from a suit brought by Michael Pohl and his law firm (collectively, Pohl) against Lance Kassab and his firm (collectively, Kassab). Pohl, a Texas lawyer, contracted with a marketing firm to help him identify about 11,000

prospective clients in Mississippi for mass tort settlements. After Pohl closed his Mississippi law office, the marketing firm took the contents of Pohl's law office, refused to return them, and sued Pohl for breach of contract in Mississippi.

Kassab, also a Texas lawyer, began investigating whether Pohl's conduct in connection with the Mississippi mass tort cases constituted barratry. Kassab entered an agreement with the marketing firm's principal to pursue claims against Pohl. As part of the agreement, Kassab acquired documents from Pohl's client files, including attorney fee contracts between Pohl and his clients and a list of Pohl's actual, potential, or rejected clients and their contact information (the client materials). Kassab notified some of these individuals that he suspected Pohl had committed barratry. Several responded to the notice and, represented by Kassab, pursued civil barratry claims and grievances against Pohl.

After settling one barratry claim and successfully defending himself against the other claims and grievances, Pohl sued Kassab, asserting that Kassab had misappropriated Pohl's client materials in violation of the Texas Uniform Trade Secrets Act (TUTSA).[1] The jury found in favor of Pohl, and the trial court entered judgment consistent with the verdict awarding Pohl $1,453,040.00 in damages, $3 million in exemplary damages, and attorney's fees.

---

[1] TEX. CIV. PRAC. & REM. CODE §§ 134A.001–134A.008.

2

On appeal, Kassab contends, in three issues,[2] that the trial court erred in entering judgment on the jury verdict because no evidence supports the jury's findings of liability and damages under TUTSA and other trial court errors require remand.

We affirm in part and reverse in part.

## Background

### Pohl becomes involved in mass tort settlements in Mississippi.

In 2012, Pohl participated with a Mississippi attorney in a joint venture to identify Mississippi clients and file their claims in the BP settlement program formed after the 2010 Deepwater Horizon oil spill. Pohl opened a Mississippi office for this purpose. At some point, Pohl also took on motor vehicle rollover accident cases that were part of a General Motors mass tort settlement.

When Pohl first got involved with the BP claims, he agreed to take on marketing to identify potential clients and pre-vet them. To assist him in those efforts, Pohl entered an agreement with a group of marketers, doing business as Precision Marketing Group, LLC (Precision), to provide public relations services, gather and preserve evidence, and screen and liaise with his clients and prospective clients.

---

[2]     Kassab raised, but abandoned, a fourth issue related to a civil barratry counterclaim.

Pohl spent between $5.5 and $6 million on all the marketing and public relations involved in the BP litigation. From these efforts, about 11,000 clients retained Pohl. Pohl had each client sign a fee agreement. Pohl had various client lists compiled, which included client contact information and other personal and private information.

Pohl stored the client materials in his Mississippi office. The office was "very secure." It had an armed guard and the office required a key to enter. The office was locked at night and had limited access during the day.

In performing the tasks outlined in its agreement with Pohl, Precision had access to compilations of documents with the names and contact information for Pohl's clients. Pohl instructed Precision and its employees that all the files were attorney-client privileged and all the information contained in the files and gathered from the clients was privileged and had to be protected. Precision agreed to maintain the confidentiality of Pohl's client materials. Pohl also instructed temporary workers who had access to the materials that they were privileged and to be kept confidential.

By the summer of 2014, Pohl had closed his Mississippi office. Scott Favre, the managing member of Precision, took the physical copies of Pohl's information and Pohl's computers.

**The marketers sue Pohl in Mississippi.**

In June 2014, Precision told Pohl that it would not return the equipment and materials taken from Pohl's office. Precision and the marketers then sued Pohl in federal court in Mississippi, claiming breach of contract and seeking quantum meruit relief for Pohl's alleged failure to pay for Precision's services (the "Mississippi suit"). Precision and the marketers alleged that Pohl contracted with them to provide public relations and marketing, for which he agreed to pay Precision a percentage of the attorney's fees for the legal claims obtained from their efforts, plus their expenses and a flat fee. Pohl counterclaimed for conversion. He asserted that Precision and the marketers had breached their contracts with him by providing his proprietary information and materials to unauthorized third parties and converting his property, including original client contracts and client personal and claim information, to their own use.

While the litigation was pending, the marketers assigned their interests in their individual marketing firms, as well as any claims they had against Pohl, to Precision, which was sold to Favre.

During a discovery dispute in the Mississippi suit, Precision sought a protective order to prevent disclosure of its marketing lists and bar Pohl from using discovery to find out whether Precision sold or disclosed them to Texas lawyers who might try to contact Pohl's former clients and pursue barratry claims against Pohl.

5

The federal district court agreed with Pohl that the information was discoverable and compelled the disclosure.

In April 2017, Pohl, Precision, and the individual marketers, including Favre, settled the Mississippi suit. In the settlement agreement, Precision and Favre agreed to return to Pohl all originals and all copies of all documents, records, and other information that concerned or identified past, current, and prospective clients of Pohl in their possession, custody, or control and to permanently delete all electronically stored information that concerned or identified any of Pohl's past, current, or prospective clients. The settlement did not disclose that in November 2016, Kassab entered an agreement with Favre, under which he received from Favre at least some of Pohl's client information and property.

**Kassab acquires and uses Pohl's client information to bring barratry claims against Pohl.**

Kassab used the information he acquired in the transaction with Favre to send State Bar-approved letters to Pohl's former clients, notifying them that they may have been unlawfully solicited. Hundreds responded and retained Kassab to pursue barratry and negligence claims against Pohl. Kassab filed four lawsuits against Pohl on behalf of hundreds of clients. Three of those cases were dismissed. Pohl paid $150,000 to settle the remaining case.

Kassab and several of his clients also filed grievances against Pohl. All were dismissed.

6

**Pohl brings this suit.**

In August 2018, Pohl brought this suit against Kassab, Precision, Favre, and two others, alleging a conspiracy to "illegally obtain[], maintain[], and use[] confidential information and property belonging to Pohl." Pohl alleged that the marketer defendants stole Pohl's information and then sold it to Kassab who "solicited those clients to act as plaintiffs . . . to bring cases against Pohl for alleged barratry and other claims." Pohl also sued Favre and Precision for breach of their settlement agreement, and all defendants for violation of TUTSA and conspiracy. Pohl sought as damages the attorney's fees he incurred defending against the barratry litigation and grievances. Kassab answered, asserting affirmative defenses, and counterclaimed for civil barratry.

Before trial, certain other defendants Pohl named in the suit agreed to settle his claims against them for payments totaling $765,000 (the "settlement credit").

**The jury finds in favor of Pohl.**

After a seven-day trial, the jury found that Pohl owned, as trade secrets, (1) "[a]ttorney client fee contracts between Pohl and his clients" and (2) "[a]ny list of the identities and contact information of Pohl's actual, potential or rejected clients." The jury also found that Kassab, Favre, and two others had misappropriated them and apportioned 70% of the fault causing the injury to Pohl. And the jury found that regarding the misappropriation, Kassab was "part of a conspiracy that damaged

7

Pohl" with Favre and the two others. The jury also found that there was clear and convincing evidence that Kassab engaged in willful and malicious misappropriation.

As damages, the jury found that Pohl was entitled to recover a total of $1,741,663 for the attorney's fees he incurred in his defense in the civil barratry and grievance proceedings; $250,000 for "the price that a willing buyer and a willing seller would have agreed on, at the time of the misappropriation, as a fair price for Kassab's use of the trade secrets"; and $200,000 as "the value of the development costs that Kassab avoided by misappropriating Pohl's trade secrets." The jury also found that Pohl was entitled to $3,000,000 in exemplary damages for Kassab's willful and malicious misappropriation.

The trial court entered judgment on the jury's verdict.

### Evidence of Trade Secret Liability

In his first issue, Kassab challenges the legal sufficiency of the evidence as to whether Pohl owned the client materials, whether the client materials constituted trade secrets, and whether Kassab misappropriated them.

This is an evidentiary-sufficiency issue for which Kassab did not have the burden of proof. When a party challenges the legal sufficiency of the evidence to support an adverse finding on which it did not have the burden of proof, the party must demonstrate that no evidence supports the finding. *Nguyen v. Hoang*, 507 S.W.3d 360, 370 (Tex. App.—Houston [1st Dist.] 2016, no pet.). "When

determining whether legally sufficient evidence supports a jury finding, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not." *4Front Eng'red Sols., Inc. v. Rosales*, 505 S.W.3d 905, 908 (Tex. 2016). "A no evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004). "If the evidence offered to prove a vital fact's existence is so weak as to do no more than create a mere surmise or suspicion, the record contains less than a scintilla." *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 842 (Tex. 2018) (citation modified).

A.     **Elements of proof under TUTSA**

Texas Civil Practice and Remedies Code Chapter 134A defines a "trade secret" as

> all forms and types of information, including business, scientific, technical, economic, or engineering information, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers, whether tangible or intangible and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:

9

(A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

TEX. CIV. PRAC. & REM. CODE § 134A.002(6). The jury instruction was consistent with this definition. We consider the quantum of evidence on each element below.

### 1.    Ownership of Trade Secret

Kassab maintains that no evidence supports the jury's finding that Pohl owned the client materials. Texas Civil Practice and Remedies Code section 134A.002(3-a) defines the "owner" of a trade secret as "the person or entity in whom or in which rightful, legal, or equitable title to, or the right to enforce rights in, the trade secret is reposed."

Pohl testified that both he and each of his clients owned their client materials. But he distinguished between an individual's ownership right in his or her own file and the right to own a compilation of his clients' information, which belonged to Pohl alone.

The record shows a dispute between Pohl and Precision over who owned the client materials. Pohl testified he had Precision prepare the client list, and he paid Precision to do so. Favre, who acquired the client list by acquiring Precision, asserted

10

that he owned the list, but this assertion does no more than create a fact issue about ownership. It would not prevent a reasonable factfinder from finding that Pohl owned the client materials. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005).

### 2. Actual or potential independent economic value

Kassab also asserts that the client materials did not derive independent economic value because they did not provide Pohl with an economic advantage.

Pohl testified that the client materials derived value from his ability to solicit existing clients, as permitted by the State Bar rules. His expert explained that compiling a list of mass tort clients was valuable because it "separated the wheat from the chaff" and identified individuals who were likely to pursue a claim. The client materials also identify who had filed suit before, which was valuable for filing future claims.

Pohl testified to the amount of money he spent on marketing to retain his clients. Pohl spent 5.5 to 6 million to create "the client base, the customer list, the trade secrets." An offer to buy the purported trade secret materials is some evidence that they had "independent economic value" for purposes of section 134A.002(6). *See Coe v. DNOW LP*, 718 S.W.3d 338, 361 (Tex. App.—Houston [14th Dist.] 2025, pet. filed). This is legally sufficient evidence to support a finding that the client materials had actual or potential economic value.

**3. Reasonable measures to maintain secrecy**.

Kassab asserts no evidence supports the jury's finding that Pohl took reasonable measures under the circumstances to keep the client materials secret.

In *FMC Technologies, Inc. v. Murphy*, 679 S.W.3d 788 (Tex. App.—Houston [1st Dist.] 2023, pet. denied), this Court emphasized that the reasonable measures inquiry was highly fact specific. *See id.* at 810. This does not mean that whether a party has used reasonable measures to preserve the secrecy of a purported trade secret is always a fact issue. In *Scientific Machine & Welding, Inc. v. Rose*, No. 03-20-00564-CV, 2022 WL 850409 (Tex. App.—Austin Mar. 23, 2022, no pet.) (mem. op.), the Third Court affirmed summary judgment after concluding that the company's information did not meet definition of trade secret. *Id.* at *2. The Third Court observed that 1) all work product related to the company's projects was available to all its employees and was not password protected; 2) the email of the owner/president was not password protected; 3) the company's vendor lists were not password-protected; 4) third-party vendors were provided drawings without any restrictions, such as non-disclosure agreements; and 5) after the defendant gave notice that he planned to work for a client of the company, was allowed to continue working for three days and continued to have "full access" to company's design work as well as customer and vendor lists. *Id.* at *3.

12

The evidence shows that when Pohl retained Precision, Pohl and Precision's own lawyers instructed Precision staff about confidentiality regarding the client materials and explained the attorney-client privilege to them. Pohl had "firm confidentiality agreements" with the Precision marketing/public relations group. He explained to Precision that the information it was collecting was attorney-client privileged, had "lots of personal data," including Social Security numbers, and had to be protected from disclosure.

Pohl testified that to maintain the confidentiality of the client materials, he kept the client materials in an office that had limited access and was locked at night. His Mississippi office required a key, and the file cabinets were lockable. The office computers were password protected. Secretaries and contract workers were advised from time to time that they were using attorney-client privileged materials and they were to safeguard the confidences in them. They were told to keep the files under lock and key and they weren't allowed to have third parties look through the files because the files had attorney-client confidential information in them.

After Pohl closed his Mississippi office, Favre, without Pohl's knowledge or consent, stole physical copies of Pohl's information and took possession of Pohl's computers. When Pohl became aware the client materials had been taken, he demanded their return.

In the Mississippi litigation, Pohl demanded the marketers return his client contracts. He was "fighting to get access" to his client materials during the lawsuit. Without his permission or knowledge, a list identifying Pohl's clients, though without addresses or other contact information, was filed in the public record in the Mississippi suit.

After the settlement of the Mississippi suit in April 2017, Pohl testified that he had "four to six months of legal wrangling" to enforce the agreement's requirement that his client materials be returned.

Kassab counters that Pohl did not seek a temporary restraining order, an injunction, a protective order, or a written confidentiality agreement to protect the client materials from disclosure in the Mississippi litigation. Given that Pohl had impressed on Precision at the outset of their relationship and multiple times during it that the client materials were confidential and to be protected from disclosure, that Pohl failed to take certain specific measures to protect them during the litigation does not negate his other efforts to protect them, nor does it render those efforts unreasonable. We hold legally sufficient supports the jury's finding that Pohl took reasonable measures under the circumstances to maintain the secrecy of his client materials.

**B. Kassab's affirmative defenses**

Kassab also asserts that the statute of limitations, public policy, attorney immunity, and the judicial proceedings privilege bar Pohl's misappropriation claim as a matter of law. We consider each in turn.

**1. Statute of limitations**

Whether a cause of action is barred by limitations is a question of law that we review de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003). "Causes of action accrue and statutes of limitations begin to run when facts come into existence that authorize a claimant to seek a judicial remedy." *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 202 (Tex. 2011). When a plaintiff discovers or should have discovered the cause of his injury and whether a plaintiff exercised due diligence in so discovering are questions of fact. *Pirtle v. Kahn*, 177 S.W.3d 567, 572 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

Texas law provides that "[a] person must bring suit for misappropriation of trade secrets not later than three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." TEX. CIV. PRAC. & REM. CODE § 16.010(a). The limitations provision also explains that "[a] misappropriation of trade secrets that continues over time is a single cause of action and the limitations period described by Subsection (a) begins running without regard to whether the misappropriation is a single or continuing tort." *Id.* § 16.010(b).

15

Pohl filed this suit against Kassab on August 28, 2018. The jury found Pohl, in the exercise of reasonable diligence, should have discovered the acquisition, use, or disclosure of his trade secrets by Kassab by August 19, 2017.

Kassab first points to Pohl's knowledge that the files and computers had been removed from Pohl's office in the summer of 2014. But no evidence before the jury shows that Kassab was involved in the removal. Instead, the evidence shows that Kassab received Pohl's client materials from Favre in the fall of 2016—within the three-year limitations period.

Kassab asserts that the initial misappropriation of a trade secret sets the limitations clock for all defendants, but the statute does not support this assertion. The drafters of the uniform trade secret statute explained that its contribution was "substitution of unitary definitions of trade secret and trade secret misappropriation, and a single statute of limitations for the various property, quasi-contractual, and violation of fiduciary relationship theories of noncontractual liability utilized at common law." UNIF. TRADE SECRETS ACT, prefatory note at 2 (UNIF. L. COMM'N 1985).

The Texas Legislature approved of these unitary definitions when it enacted TUTSA. In doing so, it recognized that "misappropriation" can take many forms. The statute explains that misappropriation means:

(A)    acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B)    disclosure or use of a trade secret of another without express or implied consent by a person who:

    (i)    used improper means to acquire knowledge of the trade secret;

    (ii)    at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:

        (a)    derived from or through a person who used improper means to acquire the trade secret;

        (b)    acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret; or

        (c)    derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret; or

    (iii)    before a material change of the position of the person, knew or had reason to know that the trade secret was a trade secret and that knowledge of the trade secret had been acquired by accident or mistake.

TEX. CIV. PRAC. & REM. CODE § 134A.002(3).

Pertinent here, TUTSA does not distinguish between direct and indirect misappropriation. Disclosure or use by a person who owed a duty to the plaintiff to keep the trade secret confidential (direct misappropriation) and acquisition by a person "from or through a person who owed a duty to" the plaintiff (indirect misappropriation) are separate and independent acts of misappropriation under TUTSA. *See id.* The applicable statute of limitations identifies discovery of "the

17

misappropriation" as the act that begins the three-year limitations period. *See* TEX. CIV. PRAC. & REM. CODE § 16.010(a).

Kassab acquired the client materials from Favre in November 2016, less than three years before Pohl filed suit in August 2018. Thus, we hold that the statute of limitations does not bar Pohl's suit.

## 2. Privilege and Immunity

Kassab asserts that three types of privilege and immunity bar Pohl's claims against it.

When a party attacks the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *see also Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 125–26 (Tex. App.—Houston [1st Dist.] 2011, no pet.). In conducting a legal sufficiency review, we review the evidence presented below in the light most favorable to the jury's verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex. 2010); *City of Keller*, 168 S.W.3d at 827. Thus, we will sustain Kassab's legal sufficiency challenge if the evidence conclusively establishes its entitlement to the affirmative defense asserted. *See Francis*, 46 S.W.3d at 241. Evidence is conclusive

18

only if reasonable people could not differ in their conclusions. *See City of Keller*, 168 S.W.3d at 816.

First, Kassab maintains that he was privileged to use the information in the client materials to inform Pohl's former clients about his alleged misconduct and to report it to the State Bar.[3] Second, he claims that attorney immunity bars Pohl's claims because he made no commercial use of Pohl's client materials until Kassab was in an attorney-client relationship.[4] Third, as to the grievances Kassab filed, the Texas Rules of Disciplinary Procedure prohibit any lawsuit against him based on the filing of a grievance.[5]

The flaw in Kassab's assertions of privilege and immunity is that the jury was not required to find that Kassab used or disclosed the client materials to find that he misappropriated Pohl's trade secrets. Question 2 of the jury charge gave the jury five

---

[3]   "[T]rade secret law permits disclosures relevant to public health or safety, commission of crime or tort, or other matters of substantial public concern." *Bartnicki v. Vopper*, 532 U.S. 514, 539 (2001) (Breyer, J. and O'Connor, J., concurring) (citing RESTATEMENT (THIRD) OF UNFAIR COMPETITION §40, cmt. c (1995)).

[4]   Attorneys are immune from liability to nonclients for any conduct within the scope of their representation of their clients. *See Youngkin v. Hines*, 546 S.W.3d 675, 681 (Tex. 2018) (citing *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). Thus, under the doctrine of attorney immunity, "an attorney does not have a right of recovery, under any cause of action, against another attorney arising from conduct the second attorney engaged in as part of the discharge of his duties in representing a party. . . ." *Bradt v. West*, 892 S.W.2d 56, 72 (Tex. App.—Houston [1st Dist.] 1992, writ denied).

[5]   *See* TEX. RULES DISCIPLINARY P.R. 17.09.

options, any of which would support a finding that Kassab misappropriated Pohl's trade secrets. Four of the options revolved around disclosure, but one did not. It required a finding only of acquisition with the specified scienter:

> To find misappropriation of a trade secret, you must find that [Kassab]—
>
> (a) Acquired the trade secret, and that the party knew or had reason to know that the trade secret was acquired by improper means . . . .

Kassab acknowledges that he had no attorney-client relationships with any of Pohl's former clients until after he acquired the client materials in November 2016. The privilege and immunities Kassab asserts would not protect the act of acquiring them. Thus, the jury charge supports the finding of liability outside of any of the protected conduct or status that Kassab identifies.

Kassab argues that attorney immunity may apply even though the conduct at issue lies outside the litigation context, but the authority he cites does not extend that far. In *Haynes & Boone, LLP v. NFTD, LLC*, the supreme court explained that

> attorney immunity provides a defense to a non-client's claims based on an attorney's conduct that (1) constitutes the provision of "legal" services involving the unique office, professional skill, training, and authority of an attorney *and* (2) the attorney engages in to fulfill the attorney's duties in representing the client within an adversarial context in which the client and the non-client do not share the same interests.

631 S.W.3d 65, 78–79, 81 (Tex. 2021) (emphasis in original). Because the attorney's conduct must be in furtherance of his duties in representing his client, attorney immunity does not protect Kassab from liability.

20

For the same reasons, we reject Kassab's argument that the judicial proceedings privilege applies to the jury's misappropriation finding. No judicial proceedings had been initiated when Kassab acquired Pohl's client materials.

We overrule Kassab's first issue.

## Damages

In his second issue, Kassab asserts that the judgment should be reformed to eliminate certain elements of damages that cannot be recovered as a matter of law.

### A.     Exemplary damages

Kassab argues that Pohl cannot recover exemplary damages because the jury charge does not show a unanimous answer in response to the predicate liability question. "We review de novo the statutory standards of recovery for exemplary damages and the legal effect of a jury's verdict. *Oscar Renda Contracting, Inc. v. Bruce*, 689 S.W.3d 305, 309 (Tex. 2024).

"[A] party seeking exemplary damages bears the burden of securing a unanimous verdict." *Oscar Renda Contracting*, 689 S.W.3d at 309. Texas Civil Practice and Remedies Code Section 41.003 permits a judgment for exemplary damages "only if the jury was unanimous" in "finding liability for and the amount of exemplary damages." TEX. CIV. PRAC. & REM. CODE § 41.003(d); *see also* TEX. R. CIV. P. 292 ("A verdict may be rendered awarding exemplary damages only if the jury was unanimous in finding liability for and the amount of exemplary damages.").

Question 17 was predicated on the following instruction:

If you unanimously answered "Yes" to any part of Question 2 [misappropriation] with respect to Kassab. [sic] Otherwise, do not answer the following question.

To answer "Yes" to any part of the following question, your answer must be unanimous. You may answer "no" to any part of the following question only upon a vote of ten or more jurors. Otherwise, you must not answer that part of the following question.

Question 17 asked the jury, "Do you find by clear and convincing evidence that the misappropriation of trade secret was willful and malicious?" The jury answered, "Yes."

Question 19 was predicated on the following instruction:

Answer the following question only if you unanimously answered "Yes" to Question No. 17 or Question No. 18.[6] Otherwise, do not answer the following question.

You must unanimously agree on the amount of any award of exemplary damages.

Question 19 asked the jury to find an amount of exemplary damages and contained the prescribed instructions. The jury found exemplary damages of $3,000,000 should be assessed against Kassab and awarded to Pohl.

Following the liability and damages questions, the trial court gave instructions for signing the verdict certificate, including the following:

All jurors should deliberate on every question. You may end up with all twelve of you agreeing on some answers, while only ten or eleven

_____

[6]    The jury did not answer Question 18.

of you agree on other answers. But when you sign the verdict, only those ten who agree on every answer will sign the verdict.

There are some special instructions before Question No. 17, 18 and 19 explaining how to answer those questions. Please follow the instructions. If all twelve (12) of you answer those questions, you will need to complete a second verdict certificate for those questions.

In the verdict certificate, the jury certified that the verdict was not unanimous and that ten jurors "agreed to each and every answer." Those ten jurors signed the certificate as instructed.

The second verdict certificate instructed the jury that if it "unanimously answered Questions No. 2, 10, 15, 16, 17, 18 and/or 19" then the presiding juror was required to sign the second verdict certificate as to those questions.

The presiding juror signed the second verdict certificate as to Question 2 and Question 19 only. Her signature appears below a statement for each of those two corresponding questions stating that she "certif[ied] that the jury was unanimous in answering [the questions]. The presiding juror has signed the certificate for all twelve of us." The presiding juror did not, however, sign the second verdict certificate for Question 17: the predicate liability finding for exemplary damages.

Pohl points to the jury's unanimous finding, in response to Question 2, that Pohl was liable for misappropriation, as support for the finding of exemplary damages in response to Question 19. But that is not sufficient. Section 41.003(d) requires a unanimous finding of "liability for . . . exemplary damages." TEX. CIV.

23

PRAC. & REM. CODE § 41.003(d). This language means that there must be a unanimous finding that the defendant acted with malice or other qualifying intent in committing the underlying wrong. *See, e.g.*, *Qwest Int'l Comm'cns, Inc. v. AT & T Corp.*, 167 S.W.3d 324, 326 (Tex. 2005) ("A corporation is liable for exemplary damages only if it (1) authorizes or ratifies an agent's malice, (2) maliciously hires an unfit agent, or (3) acts with malice through a vice principal."). That question was presented to the jury in Question No. 17.

The jury's "Yes" answer to Question 17 and the unsigned second verdict certificate for unanimity as to Question 17 are at odds regarding whether the jury was unanimous in finding Kassab liable for exemplary damages. Pohl invokes the rule that "[t]he jury is presumed to have followed the court's instructions" to maintain that the jury followed the predicate instructions requiring unanimity in its responses to Questions 17 and 19. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009). According to Pohl, Kassab's position wrongly requires us to presume that the jury ignored the trial court's predicate instructions in responding to Questions 17 and 19. Pohl asserts that we must instead presume that the presiding juror "inadvertently failed to sign the certificate of unanimity" as to Question 17 in the second verdict certificate.

Both positions are equally flawed, but together they highlight the underlying problem: when we apply the presumption that the jury followed the court's

24

instructions in reviewing the charge as a whole, we cannot construe the disparate responses in a way that harmonizes them. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 509 (Tex. 2018). There is no definitive answer as to whether the jury's answer to Question 17 was unanimous.

The next question is which party bears the consequences for this quandary. The supreme court has answered clearly: "a party seeking exemplary damages bears the burden of securing a unanimous verdict." *Oscar Renda Contracting*, 689 S.W.3d at 309. "Because the plaintiff bears the burden to secure unanimity, it is the plaintiff who must seek clarification" when a verdict ambiguously or otherwise "inaccurately reflects the jury's vote as to a particular question." *See id.* at 311. Pohl sought exemplary damages but did not ensure that the jury's findings satisfied the requirements of section 41.003(d).

Because the record does not definitively show that Pohl secured a unanimous verdict on liability for exemplary damages, we hold that the trial court erred in awarding exemplary damages.

## B. Actual damages

Kassab challenges the propriety of the jury's findings supporting the award of actual damages.

## 1. Attorney's fees as damages

Kassab argues that Pohl may not recover attorney's fees incurred in previous litigation or in defense of grievance proceedings under TUTSA as actual damages. No contract or statute allows for the recovery of the attorney's fees incurred by Pohl in the civil barratry and grievance proceedings. Pohl argues that he is entitled to recover his attorney's fees incurred in those proceedings because he was required to prosecute or defend an action as a result of Kassab's wrongful conduct.

Texas law permits recovery of attorney's fees only if allowed by contract or by statute. *Tony Gullo Motors I, LP. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006); *see Lacore Enters., LLC v. Angles*, No. 05-21-00798-CV, 2023 WL 2607562, at \*9 (Tex. App.—Dallas Mar. 23, 2023, no pet.) (mem. op.) (concluding that plaintiff's allegation that wrongful disclosure of confidential information caused "the attorney's fees that have been incurred [which] is evidence of damages" did not support TUTSA claim because "attorney's fees incurred in a lawsuit are not actual damages.").

TUTSA provides that:

> In addition to or in lieu of injunctive relief, a claimant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

26

TEX. CIV. PRAC. & REM. CODE § 134A.004. Pohl asserts that the attorney's fees he incurred constitute an actual loss caused by misappropriation. We disagree. Pohl expended the attorney's fees in the barratry litigation and grievances in defense of his own professional reputation, not to preserve his right to or recoup any loss caused by Kassab's misappropriation of the client materials.

Pohl also claims that the attorney's fees he incurred in the barratry and grievance proceedings are recoverable under the "tort of another" exception to the general rule stated in *Chapa*.

Section 914 of the Restatement (Second) of Torts states this exception as follows:

> One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.

RESTATEMENT (SECOND) OF TORTS § 914(2) (1979). The Texas Supreme Court has discussed this exception but did not address whether the exception should be adopted as Texas law. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Rsch. Corp.*, 299 S.W.3d 106, 119 (Tex. 2009); *see generally Naschke v. Gulf Coast Conf.*, 187 S.W.3d 653, 655 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (declining to apply exception because intermediate appellate courts "are bound to follow the existing laws of the State" and "are not at liberty to adopt a theory of

27

recovery that has not been enacted by the Legislature or adopted by the Texas Supreme Court").

Some Texas appellate courts have nevertheless applied the exception described in Restatement section 914(2), including this one. *See Martin-Simon v. Womack*, 68 S.W.3d 793, 797 n.2, 4 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (citing cases). In *Massey v. Columbus State Bank*, this Court affirmed a default judgment that awarded attorney's fees incurred by the Bank in responding to and defending complaints and grievances caused by the appellants' admittedly false and defamatory filings with the Texas Department of Banking, the State Bar, the Texas State Board of Public Accountancy, and the Sheriff's Department of Colorado County, Texas. 35 S.W.3d 697, 701–02 (Tex. App.—Houston [1st Dist.] 2000, pet. denied).

In applying the exception, *Massey* relied on several cases, including the Fourteenth Court's decision in *Mattly v. Spiegel, Inc.*, 19 S.W.3d 890, 898–99 (Tex. App.—Houston [14th Dist.] 2000, no pet.). *See* 35 S.W.3d at 701–02. The Fourteenth Court, however, later pointed out that *Massey* had misconstrued *Mattly*. *See Womack*, 68 S.W.3d at 798 n.4. It reiterated that neither it nor the supreme court had adopted the equitable exception and declined to do so in that case. *Id.* at 798.

Generally, this Court is reluctant to adopt a rule that conflicts with that of our sister court. "When either the First or the Fourteenth creates a conflict with the other,

an inescapable consequence is the loss of uniformity on that point of law within the shared jurisdiction." *Agar Corp., Inc. v. Electro Cirs. Int'l, LLC*, 529 S.W.3d 559, 565 (Tex. App.—Houston [14th Dist.] 2017) (Frost, C.J., concurring in order denying rehearing en banc). At any rate, this Court has not applied the equitable exception after *Massey*, and since then, the supreme court has reiterated the general rule in Texas without articulating an exception. *See Chapa*, 212 S.W.3d at 310.

Ultimately, we leave resolution of this conflict for another day. TUTSA allows for only one form of equitable recovery, that being "the unjust enrichment caused by misappropriation." TEX. CIV. PRAC. & REM. CODE § 134A.004.

Because the attorney's fees incurred by Pohl in the barratry and grievance proceedings are not an actual loss caused by the misappropriation, are not a reasonable royalty for use of the client materials, and do not purport to disgorge any unjust enrichment by Kassab, they are not recoverable under TUTSA. Thus, the trial court erred in awarding Pohl the attorney's fees he incurred in the barratry and grievance proceedings.

### 2. Other actual damages

Kassab next attacks the legal sufficiency of the evidence supporting the jury's two other actual damages findings.

To determine the value a reasonably prudent buyer would pay for a trade secret requires the plaintiff to show only "the extent of damages as a matter of just

29

and reasonable inference, even if the extent is only an approximation." *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 712 (Tex. 2016) (citation modified). "[L]ack of certainty does not preclude recovery." *Id.* at 711. In evaluating whether the jury had legally sufficient evidence on which to base its damages award, we review only the evidence tending to support the jury''s verdict and disregard all evidence to the contrary, unless it is conclusive. *Id.* at 713. "The jury generally has discretion to award damages within the range of evidence presented at trial." *Id.*

Question 7(2) asked the jury "The price that a willing buyer and a willing seller would have agreed on, at the time of the misappropriation, as a fair price for Kassab's use of the trade secret(s)." The jury found $250,000.

Kassab asserts that Pohl's testimony was no evidence of a fair price for the client materials. We disagree. As their owner and an experienced attorney with a mass tort practice, Pohl's testimony is some evidence of their value. *See, e.g.*, *Custom Transit, L.P. v. Flatrolled Steel, Inc.*, 375 S.W.3d 337, 352 (Tex. App.— Houston [14th Dist.] 2012, pet. denied) (applying property owner rule).

Kassab admitted that he and his joint venture partner paid approximately $250,000 as an initial payment on the contract with Favre, through which Kassab acquired the client materials. The contract also provided for continuing payments to Favre. Pohl estimated the value of his trade secrets as between $250,000 and $5.5 to $6 million. He arrived at the $6 million figure based on the amount he paid Precision

30

to create the list of potential clients. That amount did not include his expenses or his office expenses. The jury's finding of $250,000 for the value of the client materials is at the lower range of evidence presented at trial.

Kassab next asserts that there was no evidence of the amount that he saved in development costs. Question 7(3) asked the jury to find "[t]he value of the development costs that Kassab avoided by misappropriating Pohl's trade secret(s)." The jury found $200,000. This is lower than the estimated value of the client materials, but the evidence showed that Kassab identified some of Pohl's former clients using publicly available information, such as court filings and depositions. Legally sufficient evidence thus supports this finding.

Kassab also maintains that Pohl cannot recover both the value of the trade secret and the value of the development costs that Kassab avoided because it would amount to a double recovery. We note that TUTSA expressly allows recovery of both damages for actual loss and development costs avoided. *See* TEX. CIV. PRAC. & REM. CODE § 134A.004 ("Damages can include *both* the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.") (emphasis added). Development costs avoided is a type of unjust enrichment, which is based on "the promise implied by law to pay for beneficial services rendered and knowingly accepted." *Christus Health v. Quality Infusion Care, Inc.*, 359 S.W.3d 719, 723 (Tex. App.–Houston [1st

Dist.] 2011, no pet.) (citing *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005)). The sum of both the value of the client materials and the amount of development costs avoided found by the jury is substantially less than the $5.5 to $6 million dollars that Pohl estimated he spent to create the list of more than 11,000 potential clients. The jury's findings do not show that the jury failed to take Kassab's development costs avoided into account in finding a fair price for Pohl's client materials.

## C.    Joint and several liability

Kassab maintains that the trial court erred in finding that Kassab was jointly and severally liable based on the jury's civil conspiracy finding because conspiracy is pre-empted by TUTSA.

Conspiracy is a common law theory of liability that cannot stand without an underlying tort. *See Agar Corp.*, 580 S.W.3d at 141–42; *Coe v. DNOW LP*, 718 S.W.3d 338, 355 (Tex. App.—Houston [14th Dist.] 2025, pet. filed). Here, Question 15, which asked whether Kassab was part of a conspiracy that damaged Pohl, was predicated solely on the misappropriation finding.

We adopt the reasoning of the Fourteenth Court in *Coe* and its holding that TUTSA preempts the civil conspiracy theory of liability. *See* 718 S.W.3d at 355–56. Our sister court determined that the appellee's civil conspiracy theory was pre-empted because it required proof of trade-secret misappropriation and conflicted

32

with TUTSA because it "allows recovery of actual losses from a person who was found to have no responsibility for causing or contributing to such losses." *Id.* at 355.

For this reason, Kassab cannot be held jointly and severally liable with the three other parties whom the jury found to have conspired to misappropriate Pohl's trade secrets. The jury found that Kassab was responsible for 70% of the fault that caused Pohl's injury from the misappropriation. Accordingly, Kassab remains liable for 70% of the $450,000 in damages supported by the evidence, or $315,000. *See* TEX. CIV. PRAC. & REM. CODE § 33.012(a). The $765,000 settlement credit exceeds this amount.

Kassab also argues that Pohl is not entitled to recover his attorney's fees incurred in prosecuting this case because his recoverable damages are less than the settlement credit. TUTSA allows an award of "reasonable attorney's fees to the prevailing party if . . . willful and malicious appropriation exists." TEX. CIV. PRAC. & REM. CODE § 134A.005(3). For "prevailing party" status, "a plaintiff must prove compensable injury and secure an enforceable judgment in the form of damages or equitable relief." *Intercont'l Grp. P'ship v. KB Home Lone Star LP*, 295 S.W.3d 650, 652 (Tex. 2009). Pohl obtained liability findings and a finding of willful and

malicious misappropriation,[7] but if application of the settlement credit leaves no damages to award, Pohl is not entitled to recover attorney's fees.[8]

On remand, the trial court should determine the appropriate application of the settlement credit, consider the parties' arguments regarding the settlement credit's effect on the remaining damages findings, and render a new judgment.

## Conclusion

We affirm the judgment of the trial court as to the liability finding against Kassab, reverse in part as to damages, and remand the case to the trial court for entry of judgment consistent with this opinion.

Clint Morgan
Justice

Panel consists of Justices Rivas-Molloy, Guiney, and Morgan.

---

[7] This provision does not contain a requirement that the jury finding of willful and malicious misappropriation be unanimous. *See* TEX. CIV. PRAC. & REM. CODE § 134A.005(3).

[8] Because of our disposition of Kassab's first two issues, we need not reach Kassab's third issue. *See* TEX. R. APP. P. 47.1.